Filed 3/16/23  P. v. Williams CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SAMUEL WILLIAMS,<br><br>    Defendant and Appellant. | B315011<br><br>(Los Angeles County<br>Super. Ct. No. KA119839) |

        APPEAL from judgment of the Superior Court of Los Angeles County, Kathleen Kennedy, Judge.  Affirmed in part and reversed in part; remanded with directions.

        Richard B. Lennon and David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Samuel Williams appeals from a judgment of conviction entered after a jury found him guilty of conspiracy to commit murder and possession of a firearm by a felon with two priors. The jury found true the special allegations the offenses were committed for the benefit of a criminal street gang.

On appeal, Williams contends the trial court erred in instructing the jury on second degree murder as a part of its instructions on conspiracy to commit murder, and in failing to instruct the jury on self-defense and unanimity as to the conspiracy. Williams also argues the court erred in admitting the out-of-court statements of a codefendant who had pleaded no contest without establishing his unavailability to testify. In addition, Williams asserts the court erred in overruling his objections to the investigating detective's testimony that individuals other than Williams and his codefendants were involved in the conspiracy, and in failing to bifurcate trial on the gang allegations. Further, the cumulative errors were prejudicial.

Finally, Williams contends, the People concede, and we agree, the jury's true finding on the gang enhancement allegations must be reversed under the amendments to the criminal street gang enhancement statute (Pen. Code, § 186.22)[1] made by Assembly Bill No. 333 (2021-2022 Reg. Sess.) (2021 Stats., ch. 699, § 3) (Assembly Bill 333), effective January 1, 2022. We remand to give the People an opportunity to retry the gang enhancements and to meet their burden of proof under Assembly Bill 333's new requirements. We also remand for the trial court, in sentencing Williams, to exercise its

---

[1] Further undesignated statutory references are to the Penal Code.

2

discretion under recent amendments to section 654 made by Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441), effective January 1, 2022, which apply to Williams's convictions because the judgment was not final at the time the amendments took effect.

In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   *The Information*

Williams, along with Milik Slayton, Tony Buckner, and Deantae Williams,[2] were charged in an information with conspiracy to commit murder.  (§ 182, subd. (a)(1); count 1.)  The information alleged the co-conspirators performed six overt acts in furtherance of the conspiracy:  they 1) "acquired weapon(s)"; 2) "entered a car"; 3) "drove to rival gang's territory"; 4) "rode in a vehicle to rival gang's territory"; 5) "possessed weapons when enter[ing] rival gang's territory"; and 6) "shot at rival gang member(s)."

The information further charged Williams with possession of a firearm by a felon with two priors.  (§ 29800, subd. (a)(1); count 4.)  As to the counts against Williams, the information alleged Williams committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1)(A)-(C).)  With respect to the conspiracy count, the information alleged that in the commission of the offense Williams personally used a firearm and personally and

---

[2]   We refer to Deantae Williams by his first name to avoid confusion with appellant.  The information charged Deantae under the name "Dante Williams."

3

intentionally discharged a firearm (§ 12022.53, subds. (b) & (c)) and a principal personally used and intentionally discharged a firearm (*id*., subds. (b), (c) & (e)(1)). It was further alleged Williams suffered two prior convictions of serious or violent felonies under the three strikes law. (§§ 667, subds. (b)-(j), 1170.12.)

The information also charged Slayton and Deantae with possession of a firearm by a felon with two prior felony convictions (counts 2 & 3, respectively) and charged Slayton with attempted murder (count 5) and assault with a semiautomatic firearm (count 6). The information alleged the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang. The information also charged Corey Wright and Marcus Jones with conspiracy to commit murder and four counts of attempted willful, deliberate, and premeditated murder (counts 7-11).[3]

Williams, Slayton, and Buckner were tried together.

B.    *The Evidence at Trial*
      1.      *The gang rivalry*
      Pomona Police Officer Francesco Sacca testified as a gang expert. In August 2018 Williams, Slayton, Buckner, and Deantae were members of the Ghost Town Crips criminal street gang (GTC) in the City of Pomona. Williams's tattoos included "GTC" on his stomach, a "G" on his left shoulder, a "T" on his right shoulder for "Ghost Town," and his gang moniker "Awacc" on his right forearm. Buckner was known as "Lil Bo," and Slayton went

---

[3]    The information also charged Jones with an additional count for possession of a fireman under section 29820, subdivision (b) (count 12).

by "No good." Officer Sacca was familiar with the GTC gang and its rival criminal street gang, the 456 Island Piru Bloods (456). The territories of the 456 gang and GTC gang were adjacent to each other, and the gangs had been rivals for about 50 years. The intersection of Towne and Harrison Avenues and Willie White Park were within GTC territory.

The rivalry between GTC and 456 escalated in 2015 when a 456 member killed GTC member Jonathan "Cartoon" Watts. In response, GTC members Darnell Parker and Terry Smith killed Gregory Montgomery, a member of 456 who was over 50 years old. In August 2018 the relationship between GTC and 456 was "very bad."

2.      *The 456 music video and GTC response*

On August 14, 2018 Wright, a member of 456 with the moniker "Lil Buddha," wrote a message on the social media website Facebook that he would film a music video that day for a song titled, "Ghost Town Killa." On August 20 Wright posted the "Ghost Town Killa" music video to a video-sharing website. The video was filmed at locations within GTC territory and features numerous 456 gang members holding up their middle fingers to symbols associated with GTC. In the video, Wright wears a shirt with a "Ghost Busters" symbol to disrespect GTC.[4] The lyrics to

---

[4]      The video (exhibit 3) was played for the jury. Officer Sacca provided commentary as the video was played, explaining the meaning of aspects of the video, including how the video was intended to be disrespectful to GTC. In Sacca's testimony he also explained the meaning of slang and hand signs used in social media messages and posts by GTC members and the video later filmed by GTC members in response to the 456 video.

the song also disrespect GTC, including by threatening violence against GTC members and calling "Awacc" a "fool bitch."

In response to the filming of the Ghost Town Killa music video, members of GTC began to discuss retaliation against 456. On the morning of August 16, Williams sent a text message to someone named "Gabriel" stating, "Cuz the diccs[5] been in the set thicc and they need to die they was in the set ten deep day before yesterday I just found out." Officer Sacca explained that in this text message Williams was indicating he had learned 10 members of 456 had been in GTC territory on August 14. Minutes later Williams sent a text message to a contact called "FamØus" stating, "Cuz the diccs was in the set ten deep taking pics and some more shit niggaz gotta die period." Williams added, "On CRIP ASAP."

On August 20 at around 1:00 p.m. Deantae sent a private Facebook message to Williams with a still image taken from Wright's music video. Deantae asked whether he should call a meeting of the younger members of GTS, to which Williams replied, "ASAP." Deantae added, "Cuz call them niggas fr[o]m Vegas niggas need 3[6] set something ups," referring to how they would obtain firearms. Williams replied, "I'm on they head now," meaning he was contacting the connection in Vegas. Williams wrote that the 456 gang members who made the video would "get the boot," indicating a violent response by GTC was necessary.

---

[5] According to Officer Sacca, GTC refers to 456 as "45 diccs" or simply "diccs" as an insult.

[6] GTC commonly used the number "3" as a symbol to connote the third letter of the alphabet, "C" for "Crips." In messages, GTC members "replaced the [number] '2' which would have been for the word 'to' with '3,' for Crip."

Within a half hour, Deantae sent a private Facebook message to someone with the username "Sockit ToMy Pocket" stating, "Niggas need 3 have a y[o]ung nigga meeting asap . . . ." The recipient responded, "[L]et's link," and expressed anger about the music video. Deantae added, "Cuz we need some things [i]n da set fast," referring to GTS's need for firearms. Deantae indicated the 456 members had lots of guns. Around the same time, Deantae also sent private messages to "Pooter Willilams" stating, "Cuz da y[o]ung homies need a gun [i]n da set." The recipient agreed to procure weapons, writing, "I'm on top of it."

On the same day, Williams exchanged private messages with Ray Avalos. Williams wrote, "Soon as a burner come across get it[.] I want everyone I got the money and I'm gone have it so get on it loc." Williams was encouraging Avalos to procure guns for GTS. A few hours later, Williams messaged Avalos that members of 456 had made a video in GTS territory and posted the video online. Williams questioned why GTS members had not prevented this from happening. Williams then wrote, "Cuz get that big shit from D3 and come on." Williams clarified, "I'm talking about that chop D3 got," using slang to mean an assault rifle or similar weapon. Williams told Avalos to "go get it" and "stop playing."

On the evening of August 20 Williams, Buckner, and several others exchanged private group messages on Facebook. After James Mayes shared a link to the music video, Williams wrote, "I love it on Crip cuz now u niggz gotta sho out. If not stop bangin this." (Capitalization omitted.) According to Sacca, Williams was asking for the others to retaliate for the disrespect or they would be out of the gang. Williams later added that he

7

did not want to be questioned and expected the others to "'p[er]form'" for the gang.

The same evening, someone with the username "Räccs Løcc" sent Deantae a message with a link to the music video. Deantae asked whether Räccs Løcc had "some money" to "put on a gun with da homies." Räccs Løcc stated "I got guns" and "got my gun plug" for "anything we need," referring to a source for obtaining firearms. Deantae told Räccs Løcc to bring the guns to GTS territory as soon as possible.

Early on the morning of August 21, Williams wrote a lengthy private group message on Facebook to Buckner and eight other recipients, encouraging them to retaliate against 456 for the music video. Williams wrote, "All the lil homies and big homies know lil awac still go hard asf," referring to himself and his willingness to take action for GTS. Williams continued, "Cuz them lil boys did do some disre[s]pectful shit that all of them gone pay for. . . . This shit just started war nigga and u don[']t [want to be] th[ere] in the middle." (Capitalization omitted.) Someone with the username "Day-Day Foek" responded in agreement, "On cripk." Williams related that Wright worked at the Rite Aid on Holt,[7] then requested the recipients "shut this group chat" down and "start a new one" because there was "to[o] much business on here." (Capitalization omitted.)

Also on the morning of August 21, someone with the username "BG Rich Mac" sent Deantae a private Facebook message with an image of several handguns in a display case with the message "[s]hit like this 300 and up." About an hour later Deantae sent a message to someone with the username

---

[7]     Williams had similarly messaged Deantae on August 20 that Wright worked at the Rite Aid on Holt.

"Smerphys Law" asking, "[Yo]u kno[w] w[h]ere we can get a [gun emoji] so we can do [ou]r thing on da 45diccs[?]" Smerphys Law replied, "Let me hit up my boy cuz he got a hook up," but later added, "No go on the burners," indicating he or she was not able to locate any firearms.

On August 24 Williams sent a private Facebook message to someone with the username "Gstone Locsta," stating, "They bringing me that big thang from Vegas cuz it's on." Gstone Locsta responded, "They need 3 bring the poppers to[o]," and requested additional .380- and .40-caliber firearms.

The next day at around 2:15 p.m. Williams sent a private Facebook group message to multiple recipients, including Buckner and eight others. Williams wrote that there was "a job" that "need[ed] to be done" and questioned why GTC members would "claim some shit [they] can't respect." Williams continued, "My whole time from the set I been making NIGGAZ respect it and I'ma continue to do so. Fucc 456 and not for play play."

At around 3:15 p.m. Williams sent a private message to Slayton with an image of an assault rifle "with several [gun] attachments." Williams wrote, "With 100 on it 223 and 552," referring to the 100-round drum magazine attachment and to the compatible caliber of ammunition. Around the same time Slayton sent Buckner a private message on Facebook asking, "Y'all grabbed the thang already[?]" Buckner responded in the affirmative. Slayton continued, "Okill we got a ride rn so we Trynna grab errthing," indicating he wanted to grab all the available firearms right then. Buckner responded, "Yea come on let's go to the set," meaning GTS territory.

9

3.      *The August 27 shooting and aftermath*

At around noon on August 27 an individual called 911 and reported hearing around 15 shots fired near Willie White Park in Pomona (in GTC territory).  Pomona Police Officer Devyn McIver responded to the scene, where he recovered four expended nine-millimeter casings.  The police obtained video surveillance footage of the incident showing an individual firing a gun and then ducking down, followed by the shooter and several other people running toward two cars parked at the end of a cul-de-sac.

That evening Slayton sent a private Facebook message to someone with the username "Mistah Pomona."  Slayton wrote, "[T]he diccs tried to slide today an[d] I stopped the whole play cuh."  Officer Sacca interpreted Slayton's message to mean 456 members had come to GTS territory to attack GTS members, but Slayton stopped them.  Mistah Pomona responded he would "see wassup with the big homie" and asked Slayton whether he had a car for transporting the assault rifle.  Slayton also exchanged text messages with an individual with the username "Bg Flexin On Em."  Slayton wrote "they tried [t]o get it craccin today" but "I seen em first an[d] tried to do my shit[.]  [¶]  It jammed."  Slayton added, "I got off like 5."  Slayton stated he needed more nine-millimeter ammunition, to which Bg Flexin On Em replied, "Hey like $28 I'll go buy them from big 5 because I need some [too]."

The next day Slayton exchanged messages with Williams.  Slayton wrote, "[T]hey came back 2 cars deep yesterday."  Williams questioned, "And did what?"  Williams continued, "It's time for that big boy see if you can find some 223 [s]hells I only got like 30 on it."  Williams was indicating he only had 30 rounds

10

for the assault rifle.[8]  The next day Slayton again messaged Bg Flexin On Em, asking where he could find "223 shells."  Bg Flexin On Em replied, "Big 5" or "Walmart" and asked, "Did y'all get craccin[?]"  Slayton answered in the negative, explaining he did not have a car.  Bg Flexin On Em replied, "[B]ut y'all got a chop," referring to the assault rifle.  Slayton replied, "Yupk I'm just waiting for this nigguh to say we gone do our shit so we can go get it."

4.    *GTC members enter 456 territory on August 29*

On August 29 at around 8:00 a.m. Deantae sent Buckner a private Facebook message asking, "U got the thing on u[?]"  Buckner responded in the affirmative.  Deantae indicated he also had a gun, and Deantae and Buckner agreed to meet in GTS territory with Slayton, who was already there.  At around 8:20 a.m. Deantae received a private Facebook message from Lisa Ayech asking, "What's going on[?]"  Deantae replied, "Nothing riding in [P]omona lookin for niggas," indicating he was looking for 456 members.  Between 9:10 and 11:11 a.m., six phone calls were placed between Williams and Deantae.

Sometime before 12:30 p.m. a video was shot depicting Deantae, Slayton, and Buckner standing near the intersection of Vassar and Lennox Streets in Pomona in the heart of 456 territory.[9]  In the video Deantae states, "Fuck dics nigga" and

---

8    According to Pomona Police Detective Dolgovin, the term "big boy" referred to an assault rifle.  Detective Dolgovin provided additional commentary on the meaning of the messages exchanged between Williams and others.

9    The video (exhibit 3B) was played for the jury.  Officer Sacca interpreted the meaning of this video for the jury as well.

11

"[w]e in y'all shit, bitch." Slayton has a firearm visible in his front right pocket and states, "[W]e out here lookin for niggas though" and "[w]e not joking. . . . [C]ome on now nigga." Buckner does not speak but has a firearm protruding from the pocket of his shorts and raises his middle finger with one hand while raising four fingers on the other. Officer Sacca described the gestures as indicating "'fuck you' to 456." According to Officer Sacca, the video showed that Deantae, Slayton, and Buckner had entered 456 territory to provoke a violent encounter with 456 gang members. At about 12:30 p.m. Deantae sent the video by private Facebook message to Travon Moore and wrote that the group of men had 100 rounds on them. Deantae sent the video to others by private Facebook message, including Mistah Pomona, who in turn posted the video publicly on Facebook at 12:44 p.m.

In an eight-second video shot by Deantae on his phone at 1:07 p.m., a bald man in a blue polo shirt can be seen driving a car with a Saturn logo on the steering wheel. According to Pomona Police Detective Daniel Watkins, Slayton, Buckner, and Deantae can be seen in the video as passengers in the vehicle.[10]

5.  *The August 29 shootout*

At around 1:30 p.m. Roman Jackson was traveling southbound in his truck near the intersection of Towne and Harrison Avenues in Pomona when he saw two cars "racing" northbound.[11] The first car, a blue Saturn SUV, crashed and

---

[10]     The video was played for the jury.
[11]     Jackson testified he observed the events at around 12:30 p.m. on August 29. However, the other evidence, including the 911 call, is more consistent with the events occurring about an hour later.

came to rest in the median. A Black man exited the SUV holding a rifle. Jackson heard 30 to 35 gunshots as he ducked down on the floor of his truck. After the gunfire stopped, Jackson exited his vehicle, finding blood on the front bumper and grill of his truck.

A witness who called 911 stated that a blue SUV ran a red light when it collided with a silver sedan. After the collision, men in a "lighter colored" four-door car began to fire at the SUV. There were "at least eight [B]lack men all shooting and running." The men who exited the blue SUV ran across the median into a residential neighborhood, leaving the vehicle behind. The light-colored car drove away to the north.

Claremont Police Lieutenant Karlan Bennett responded to the scene and began searching for the shooters. She located three Black men walking north together in a group about a third of a mile from the accident scene. Bennett radioed for backup. The group began to run. Multiple police officers responded to Bennett's call. One officer detained Williams and Deantae, who were "sweating profusely and breathing heavily as though they had been running." Another officer located Slayton hiding under a boat trailer near a residence and arrested him. A third officer located Buckner in a house on Jayson Court "just north" of the accident scene. Buckner had several gunshot wounds and was transported to the hospital.

6. *The investigation*

Pomona Police Officer Matthew Looney responded to the accident scene. From the driver's side floorboard inside the blue SUV, Officer Looney recovered a semi-automatic firearm containing 13 rounds of ammunition, including a live round in

13

the chamber. The appearance of the firearm was consistent with the firearm seen on Buckner in the August 29 video.

Mail addressed to Williams was found on the front passenger seat. Extraction reports were later generated for each of the phones, which catalogued the photos, text messages, call logs, and other information stored on the phones. One of the phones appeared to belong to Williams because it was connected to his social media accounts, contained photos of him, and included messages identifying him as the user of the phone.

In the area surrounding the accident scene, a Pomona Police Department crime scene investigator recovered spent nine-millimeter ammunition, .25- and .40-caliber casings, two live rounds of 7.62-millimeter (.30 caliber) ammunition, and a live round of nine-millimeter ammunition.

Detective Watkins discovered a Ruger nine-millimeter firearm on Jayson Court near Stanton Street with a live round in the chamber. The firearm had a two-tone coloration consistent with the firearm seen on Slayton in the August 29 video. A DNA test performed on the firearm showed the presence of Williams's and Slayton's DNA, with Williams contributing 88 percent and Slayton contributing 9 percent. Ballistics testing showed the firearm matched five casings found at or near the August 29 accident site and four casings found near the site of the August 27 shooting.

Detective Dolgovin also recovered a dark blue polo shirt from a bush on Edwin Street near the site of the accident. The shirt had the number "3" on both shoulders. The shirt was consistent in appearance with the one the driver wore in the August 29 video shot by Deantae inside the vehicle. Testing

14

showed the shirt contained DNA from four individuals; 75 percent of the DNA was from Williams.

Detective Dolgovin discovered a nine-millimeter firearm near the accident scene on Jayson Court. The firearm was in "slide lock" condition with an empty ammunition magazine, indicating it had been fired until it was emptied.

While in custody, Williams and Slayton were swabbed for gunshot residue. Samples taken from Williams showed one particle "characteristic" of gunshot residue (correct shape and all three elements of gunshot residue), while Slayton's test showed two particles characteristic of gunshot residue and two particles "consistent" with gunshot residue (missing one of the elements of gunshot residue). Williams "could have fired a firearm, been in close proximity to somebody who fired a firearm, or in some other way c[o]me in contact with gunshot residue."

On August 30 Wright was arrested, and a .25-caliber semi-automatic firearm was recovered from a nearby location at the time of the arrest. The firearm contained Wright's DNA and matched some of the ballistics evidence found at the August 29 accident scene.

On September 1, 2018 Pomona Police Officer Aaron Peeden discovered a Sig Sauer assault rifle with an attached drum magazine in a trash can on Stanton Street. The magazine contained 14 rounds of live 7.62-millimeter ammunition and had the capacity to hold 100 rounds of either .223 Remington or 5.56 x 45-millimeter ammunition. The rifle contained an additional round of 7.62 ammunition. The live 7.62-millimeter rounds found at the accident scene matched the live rounds found in the rifle and magazine. The 7.62-millimeter rounds could be loaded into the magazine and rifle, but they are too heavy to be fired by the

15

weapon. A black bag found in the rear of the SUV appeared to fit the Sig Sauer rifle. A test performed on the rifle magazine showed the presence of DNA from four individuals, with Williams a 40 percent contributor.

On November 11, 2018 three members of 456 were arrested and four firearms were recovered during the arrest, two of which matched ballistics evidence from the August 29 accident site. On January 9, 2019 Buckner was arrested.

### 7. *Jail calls*

On August 29, 2018 Deantae made a recorded call from jail to Margarita Carter. Deantae told Carter he was in jail, explaining, "I was on my way home . . . and this is where some bullshit happened." Deantae said he tried to keep going but "[t]hey got behind us, babe." Carter said she had heard about a "shooting on Towne" and she had seen "[t]hat video . . . y'all did earlier with Little Bo and all."

On September 15, 2018 Williams made a recorded call from jail to an unknown individual. During the call, Williams said, "tell D-3 . . . that shit that he brought out here to a nigga don't work" and "did not work at all." Williams then repeated, "[T]hat shit that D-3 and them brought out here cuz did not work . . . ."

### 8. *The Perkins operation*

On January 7, 2019 Detective Dolgovin conducted a *Perkins* operation[12] to surreptitiously record a jail conversation between

---

[12] The parties refer to the police operation in which the People obtained Wright's statements to an undercover law enforcement agent as a "*Perkins* operation." (See *Illinois v. Perkins* (1990) 496 U.S. 292.)

Wright and an undercover law enforcement agent. During the conversation, Wright admitted he was a member of the 456 gang. Wright said he had been in a shootout. He had seen a video made by GTC members "in the hood on Vassar" Street. Wright and others began to look for them. Wright continued, "I'm guessing they left. But then they came back and tried to make another video." Wright saw a blue car and the "next thing you know . . . they see us and try to take off in their car. So . . . we chase them niggas down." During the chase, "this nigga pulled a gun out the car to try and scare us," but Wright did not believe he would shoot. When the car they were chasing crashed, Wright and his confederates began firing on them, shooting at their car. They "[l]et the whole car have it." Wright described that "it was one older nigga" who "was the only nigga busting back. The other two niggas from the other side was running with their shit. Trying to get out of there." Wright believed two of the GTC members were shot and the person firing back at Wright and his confederates was "the only nigga that didn't get shot." Wright identified one of the GTC members as "Awacc," who was 42 years old and "big."

9.      *Additional gang evidence*

Officer Sacca testified GTC's primary activities include tagging, narcotics sales, theft, grand theft, robbery, assault with a deadly weapon, illegal possession of firearms, and murder. Officer Sacca testified as to three predicate offenses committed by GTC gang members: Parker's and Smith's convictions for the murder of Montgomery; Mohammad Alrazaa's conviction for possession of a firearm; and Obina Ezeh's conviction for making criminal threats.

Presented with a hypothetical based on the evidence presented in the case, Officer Sacca opined that the conduct would benefit the gang because it was done in response to a derogatory music video that "showed very blatant, very aggressive disrespect" to the gang. By going on the offensive against its rival, the gang benefitted because the rival gang would hesitate to disrespect the gang again, and the gang would be able to protect and maintain its territory. In addition, community members would be reluctant to talk to the police for fear of retaliation.[13]

C.    *The Jury Verdicts and Sentencing*

On February 28, 2020 the jury found Williams guilty on counts 1 and 4 and found the gang allegations true as to each count. The jury could not reach a verdict on the special allegation that in the commission of the conspiracy Williams or a principal personally used a firearm or personally and intentionally discharged a firearm.

The jury could not reach a verdict on count 1 for conspiracy to commit murder as to Buckner and Slayton. Nor could it reach a verdict on count 6 for assault with a semiautomatic firearm as to Slayton. The jury acquitted Slayton of attempted murder in connection with the August 27 shooting (count 5). The jury found Slayton guilty of possession of a firearm by a felon with two priors (count 2) and found the gang allegation true as to that count.

On September 8, 2021 the trial court sentenced Williams to an indeterminate term of 75 years to life on count 1 for

_____

[13]    Williams did not call any witnesses in his defense.

18

conspiracy to commit murder (25 years to life tripled under the three strikes law) with a 15-year minimum parole eligibility date for the gang enhancement.[14]  The court stayed under section 654 a three-strikes sentence of 25 years to life on count 4 for felon in possession of a firearm.

## DISCUSSION

A.  *The Trial Court's Error in Instructing the Jury on Implied*
   *Malice Murder as a Theory of Conspiracy To Commit*
   *Murder Was Harmless*
   1.     *Trial court proceedings*

With respect to count 1 for conspiracy to commit murder, the trial court instructed the jury with CALCRIM No. 415 that the People had to prove Williams "intended to agree and did agree with any alleged co-conspirator . . . to commit the crime of murder,"[15] that "[a]t the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit the crime of murder," and at least "[o]ne of the alleged members of the conspiracy or any combination of the members committed at least

---

[14]     Williams admitted he suffered two prior convictions of serious or violent felonies.  (§§ 667, subds. (b)-(j), 1170.12.)
[15]     The trial court's oral instructions to the jury appear inadvertently to have omitted the line from the written instructions that the jury must find "[t]he defendant intended to agree and did agree with any alleged co-conspirator."  However, the court's oral and written instructions included the instruction, "The People must prove that the members of the conspiracy had an agreement and an intent to commit murder."  Williams does not contend the omission was error.

19

one of the . . . alleged overt acts to accomplish the crime of murder." The court instructed further, "To decide whether a defendant and one or more of the other alleged members of the conspiracy intended to commit murder, please refer to the separate instructions . . . on that crime." The court also instructed that conspiracy to commit murder required proof of a defendant's specific intent.

The court's instructions on murder stated the jury must find "the defendant acted [with] a state of mind called malice aforethought." The instruction continued, "There are two kinds of malice aforethought; express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice if he unlawfully intended to kill. The defendant acted with implied malice if . . . he intentionally committed an act; . . . the natural and probable consequences of the act were dangerous to human life; . . . at the time he acted he knew his act was dangerous to human life; and . . . he deliberately acted with conscience disregard for human life." (Capitalization omitted.) The instructions stated further, "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with premeditation," and defined those terms for the jury. The instructions did not include any reference to or definition of second degree murder.

During his closing argument, the prosecutor argued Williams, Buckner, Slayton, and Deantae agreed to "intentionally and unlawfully kill." The prosecutor emphasized, "The question in this case . . . is whether these individuals intended to commit murder . . . ." As evidence of Williams's intent to commit murder, the prosecutor pointed to messages sent by Williams to others

20

after learning at least 10 members of 456 had been in GTC territory.  In those messages, Williams stated "they need to die" and "they gotta die, period."  The prosecutor also highlighted Williams's messages to a group of recipients urging them to take action, including his statement, "All of them gonna pay.  This shit just started war."  The prosecutor argued Williams sought and obtained an assault rifle to use against 456, which "is one of the most potent weapons" and "far more powerful than a handgun."  The prosecutor concluded by requesting the jury return "a verdict that acknowledges that the defendants conspired to violently and lethally retaliate against 456," resulting in "two midday gun battles."

In closing, Williams's attorney argued the defendants had not formed an agreement to commit murder.  He noted Williams's statements that 456 members needed to die were made to persons other than Buckner, Slayton, and Deantae.  Further, the People needed to prove Williams "intended to agree and did agree" to "commit the crime of murder."

In rebuttal, the prosecutor reiterated the jury had to find the defendants intended to commit murder in order for the jury to convict on the conspiracy charge.  He argued in response to defense counsel's claim the defendants had no intent to kill, "[Y]ou're going to be asked in the verdict forms to deal with something.  Was it conspiracy to commit first degree murder or conspiracy to commit second degree murder?"  He explained, "For second degree murder . . . [t]here's two ways to get there.  There is express malice and implied malice.  Express malice, as the instruction says, means the intent to kill.  If you have the intent to kill, you are . . . acting with express malice.  If you do something that's so inherently dangerous, it's implied malice."

21

The prosecutor then read the jury instruction on implied malice, adding "there's no question that we have the intent to kill. So it is at least a second. With conspiracy to commit murder, you don't have implied malice. It doesn't even apply to conspiracy to commit murder. You have to have the express malice, intent to kill." The prosecutor explained that first degree murder required a finding of express malice, and he discussed the elements of first degree murder as set forth in the jury instructions. He then argued, "So when you're dealing with conspiracy, it's unequivocally conspiracy to commit a first degree murder. It's not a heat-of-passion sort of situation that just popped up on them. They had days to deal with this, prepare themselves, make their plan, get their guns, bring that big gun, [and] drive into a rival hood."

>        2.      *Governing law and standard of review*

"Conspiracy "'is an inchoate offense, the essence of which is an agreement to commit an unlawful act.'"'" (*People v. Ware* (2022) 14 Cal.5th 151, 163; accord, *People v. Swain* (1996) 12 Cal.4th 593, 599-600 (*Swain*) [crime of conspiracy "does not require the commission of the substantive offense that is the object of the conspiracy" and "'fixes the point of legal intervention at [the time of] agreement to commit a crime'"].) A conspiracy has four elements: "(1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator." (*Ware*, at p. 163; accord, *People v. Johnson* (2013) 57 Cal.4th 250, 257.)

"[T]here is no crime of 'conspiracy to commit second degree murder . . . .' Rather, 'all conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder.'" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 641 (*Beck and Cruz*); accord, *People v. Cortez* (1998) 18 Cal.4th 1223, 1231-1232 ["The mental state required for conviction of *conspiracy* to commit murder necessarily establishes premeditation and deliberation of the target offense of murder—hence all murder conspiracies are conspiracies to commit first degree murder . . . ."].)

We review a claim of instructional error de novo. (*People v. Mataele* (2022) 13 Cal.5th 372, 419; *People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*Mitchell*, at p. 579; accord, *People v. Ramirez* (2021) 10 Cal.5th 983, 1005 ["the prosecutor's closing argument must also be considered alongside the court's instructions and the defense's argument"]; *People v. Young* (2005) 34 Cal.4th 1149, 1202 ["The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury."].)

Where a trial court instructs the jury on two legal theories, one of which is legally erroneous—here, that the jury could find

23

Williams guilty of conspiracy to commit implied malice murder—"[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 13 [erroneous instruction that jury could consider a box cutter an inherently deadly weapon constituted harmless error because no reasonable jury would have failed to find defendant used the box cutter in a deadly manner]; accord, *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1090 [erroneous instruction that the jury could find gang enhancements true based on a finding gang members individually, rather than collectively, engaged in a pattern of criminal gang activity was not harmless beyond a reasonable doubt]; see *Chapman v. California* (1967) 386 U.S. 18, 24 ["beyond a reasonable doubt" standard applies to federal constitutional errors].)

3. *The court's implied malice instruction was harmless beyond a reasonable doubt*

Williams argues and the People concede the trial court erred in instructing the jury on implied malice murder. Williams contends the jury likely applied the implied malice instruction in an impermissible manner to convict him of conspiracy to commit murder, asserting the prosecutor aggravated the error by stating during his rebuttal argument the jury would need to choose on the verdict whether the conspiracy was to commit first or second degree murder. Although the prosecutor's statement was incorrect (the verdict form did not require the jury to make any such finding, nor should it have), in light of the entire record we

conclude the instructional error was harmless beyond a reasonable doubt.

*Beck and Cruz, supra*, 8 Cal.5th at pages 641 to 643 is instructive. There, defendants were tried for conspiracy to commit murder, as well as four counts of first degree murder. The trial court, as here, instructed the jury with the general instruction on conspiracy (CALCRIM No. 415), and not the more specific instruction on conspiracy to commit murder (CALCRIM No. 563). (*Beck and Cruz*, at p. 642.)[16] And, as here, the trial court's instructions defined malice aforethought to include both express and implied malice. (*Id.* at p. 642.) The Supreme Court found the error was harmless, reasoning, "[T]he court did not instruct on implied malice murder when it specifically instructed on premeditated first degree murder . . . . Nor did the prosecutor invite the jury to convict Beck or Cruz of either murder or conspiracy to commit murder on a theory of implied malice, but

---

[16] CALCRIM No. 563 specifies that to prove a conspiracy to commit murder, the jury must find that "[a]t the time of the agreement, the defendant and [one or more of] the other alleged member[s] of the conspiracy intended that one or more of them would intentionally and unlawfully kill." As the Supreme Court observed in *Beck and Cruz, supra*, 8 Cal.5th at page 642, the bench notes to CALCRIM No. 415 caution, "If the defendant is charged with conspiracy to commit murder, do not give this instruction. Give CALCRIM No. 563, Conspiracy to Commit Murder." (See *Beck and Cruz, supra*, 8 Cal.5th at p. 642.) Had the trial court here instructed with CALCRIM No. 563, it would have avoided the problem created by its incorporation of the murder instructions into the instruction for conspiracy.

25

rather urged the jury to find them guilty of first degree premeditated murder." (*Id.* at p. 643.)[17]

Although the prosecutor inexplicably (and erroneously) suggested in his closing argument that the jury could find the defendants guilty of conspiracy to commit second degree murder under an express or implied malice theory, the prosecutor explained in his rebuttal that the implied malice instructions were inapplicable: "With conspiracy to commit murder, you don't have implied malice. It doesn't even apply to conspiracy to commit murder. You have to have the express malice, intent to kill." (Compare *Swain, supra,* 14 Cal.5th at p. 607 [instruction on implied malice in case of conspiracy to commit murder was prejudicial where "prosecutor repeatedly referred to implied malice in closing arguments" and stated "'this could very easily be an implied malice case'"].)

---

[17] Williams correctly notes the Supreme Court in *Beck and Cruz,* in finding the instructional error was harmless, also relied on the jury's express findings in convicting the defendants of first degree murder that the defendants had committed five overt acts for purposes of carrying out the conspiracy, including acts in preparation for murder and the killing of the four victims. (*Beck and Cruz, supra,* 8 Cal.5th at pp. 643-644.) Although no similar findings were made by the jury here, we do not read *Beck and Cruz* to hold these findings were essential to the court's ultimate conclusion the error was harmless. The factors present here—the instructions given, the strength of the evidence, and the prosecutor's disclaimer of reliance on an implied malice theory and repeated emphasis that the evidence showed Williams's intent to kill 456 gang members—support our conclusion the court's error in instructing the jury on implied malice was harmless beyond a reasonable doubt.

Moreover, as the *Beck and Cruz* court observed, "'a conspiracy to commit an implied malice murder is a logical impossibility under the law.'" (*Beck and Cruz, supra*, 8 Cal.5th at page 644.) The court reasoned, "Conspiracy to commit implied malice murder 'would be at odds with the very nature of the crime of conspiracy . . . precisely because commission of the crime could never be established, or be deemed complete, unless and until a killing actually occurred.'" (*Ibid.*) The absence of a killing in this case lessens the likelihood the jury relied on the implied malice instruction in convicting Williams of conspiracy to commit murder because the instructions were factually inapplicable to the evidence. As the *Beck and Cruz* court concluded (even with a killing), "In light of the court's instructions and the way the prosecution argued this case to the jury, we find no reasonable possibility that the jury embraced the 'logical impossibility' of a conspiracy to commit implied malice murder as opposed to convicting [Williams] of conspiracy to commit murder upon a finding of intent to kill." (*Ibid.*)

In addition, the evidence of Williams's intent to kill members of the 456 gang was very strong. In response to learning 10 members of 456 had been in GTC territory, Williams wrote in a message to one recipient that the 456 members "need to die" and to another they "gotta die period." To the latter message, Williams added, "On CRIP ASAP," emphasizing his seriousness. After learning of Wright's disrespectful music video, Williams began making efforts to procure guns and amass ammunition for use in retaliation, and he directed Deantae and other members of GTC to do the same. Williams procured an assault rifle with a high-capacity magazine for this purpose. Consistent with his choice of weapon to maximize lethality,

Williams characterized the actions of the 456 members as "start[ing] war." This evidence shows Williams's intent was not to commit some undisclosed act that was merely dangerous to human life, but rather, an intent to kill.

We recognize Williams argues the "greater problem" in instructional error was that the jury may have convicted Williams of conspiracy to commit express malice second degree murder (without premeditation and deliberation). He posits that the jury may have convicted based on a "spur-of-the-moment agreement to kill in justifiable self-defense" during the shootout following the August 29 car crash. However, the trial court did not instruct the jury on second degree express malice murder, and therefore there was no instructional error.[18] Moreover, although the prosecutor incorrectly referenced second degree murder in his rebuttal argument, he later disclaimed any reliance on the theory by stating, "[W]hen you're dealing with conspiracy, it's unequivocally conspiracy to commit a first degree murder. It's not a heat-of-passion sort of situation that just popped up on them." To the extent Williams is arguing prosecutorial misconduct based on the prosecutor's discussion of

---

[18]    At oral argument Williams's attorney asserted the trial court did instruct on second degree murder. Although counsel is correct that the court instructed with CALCRIM No. 520 on first and second degree murder with malice aforethought, the instruction did not contain the optional language that states, "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined" in the CALCRIM instruction on first degree murder.

second degree murder in his rebuttal argument,[19] there is no reasonable likelihood the jury convicted Williams on this theory for which it was not instructed and the prosecutor ultimately argued did not apply. (See *People v. Young* (2019) 7 Cal.5th 905, 932-933 ["""A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that

---

[19] We acknowledge """it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements.""" (*People v. Bell* (2019) 7 Cal.5th 70, 111; accord, *People v. Centeno* (2014) 60 Cal.4th 659, 666.) However, Williams argues on appeal there was instructional error, not prosecutorial misconduct. To the extent Williams seeks to assert a claim of prosecutorial misconduct based on the prosecutor's statements, Williams forfeited the contention by failing to raise a timely and specific objection in the trial court. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 ["It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal."]; *People v. Pearson* (2013) 56 Cal.4th 393, 426 ["""[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety."""].) Further, "'[w]hen attacking the prosecutor's remarks to the jury, the defendant must show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner."""" (*Bell*, at p. 111.) In light of the prosecutor's statement in rebuttal that the conspiracy was to commit a first degree murder, there is no reasonable likelihood the jury improperly applied the comments.

a result more favorable to the defendant would have been reached without the misconduct.""'].)  And significantly, the only evidence presented was that the conspiracy occurred when Williams and other GTC members planned their retaliatory incursion into 456 territory, not after Williams and the other GTC members entered 456 territory with their high-powered weapons looking for rival gang members and the car crash ensued.

B.  *The Trial Court Did Not Err in Failing To Instruct the Jury on Unanimity Regarding the Conspiracy*

Williams argues the trial court erred by failing sua sponte[20] to instruct the jury it must unanimously agree upon the specific conspiracy Williams committed because the evidence showed multiple, discrete conspiracies.  Williams contends the evidence showed three possible conspiracies:  (1) a possible conspiracy by Williams and others to retaliate against 456 (the post-video conspiracy); (2) a conspiracy between Williams, Buckner, Slayton, and Deantae on the morning of August 29 to arm themselves and enter 456 territory; and (3) a conspiracy formed during the

---

[20]     Williams's attorney did not request a unanimity instruction, but "[i]n criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953; accord, *People v. Kopp* (2019) 38 Cal.App.5th 47, 84 ["'[A] trial court in a criminal case is required—with or without a request—to give correct jury instructions on the general principles of law relevant to issues raised by the evidence.'"], limited review granted Nov. 13, 2019, S257844.)

August 29 shooting after the GTC members crashed the SUV and Wright and the other 456 members opened fire on the vehicle. We are not persuaded.

### 1. *Governing law and standard of review*

"In a criminal case, a jury verdict must be unanimous," and "the jury must agree unanimously the defendant is guilty of a *specific* crime." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*); accord, *People v. McDaniel* (2021) 12 Cal.5th 97, 145.) "But the jury need not unanimously agree on subsidiary factual issues, such as specific details of the act." (*McDaniel*, at p. 145; accord, *Russo*, at p. 1132.) "'[W]here the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or . . . the "theory" whereby the defendant is guilty.' [Citation.] 'In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction.'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 878; accord, *People v. Garcia* (2022) 76 Cal.App.5th 887, 896.)

"If only one agreement existed only one conspiracy occurred, whatever the precise overt act or acts may have been." (*Russo, supra*, 25 Cal.4th at p. 1135; accord, *People v. Kopp* (2019) 38 Cal.App.5th 47, 84 ["'[T]he essence of the crime of conspiracy is the agreement, and thus it is the number of the agreements

31

(not the number of the victims or number of statutes violated) that determine the number of the conspiracies.'"], limited review granted Nov. 13, 2019, S257844.) "'"Performance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a 'single overall agreement.'"'" (*Kopp*, at p. 84; see *Russo*, at p. 1135.)

"[W]hen the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Russo, supra*, 25 Cal.4th at p. 1132.) "'The prosecution can make an election by "tying each specific count to specific criminal acts elicited from the victims' testimony"—typically in opening statement and/or closing argument. [Citations.] [¶] Under these principles, there is an implicit presumption that the jury will rely on the prosecution's election and, indeed, is bound by it.'" (*People v. Brugman* (2021) 62 Cal.App.5th 608, 627; accord, *People v. Brown* (2017) 11 Cal.App.5th 332, 341.)

"Because our consideration of whether the trial court should have given a particular jury instruction involves a mixed question of law and fact which is '"predominantly legal,"' we review de novo whether the specific instruction was required." (*People v. Sorden* (2021) 65 Cal.App.5th 582, 616; accord, *People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.)

2.      *A unanimity instruction was not required*

The People charged and tried only one conspiracy: the conspiracy among GTC members to murder 456 gang members in retaliation for the disrespectful music video Wright and others made in GTC territory. The prosecutor's closing and rebuttal arguments are consistent with this single theory of the crime,

with no suggestion the agreement was anything other than an agreement among members of GTC to kill in retaliation. The additional conspiracies Williams fashions are merely acts taken in furtherance of that agreement, alleged in the complaint and argued at trial as overt acts. As discussed, there is no evidence of a spontaneous agreement formed among Williams, Buckner, Slayton, and Deantae to return fire after their SUV crashed and the 456 members who had been chasing them began to shoot, nor did the People argue any such agreement as a basis for conviction. By contrast, Williams exchanged messages with more than a dozen individuals following the filming of the 456 video evidencing an intent to kill, including his August 16 message that 456 members needed to "die," and Deantae responded by organizing GTC members and working with Williams to procure guns and ammunition. Indeed, it was Deantae who first suggested Williams reach out to his contacts in Vegas to "set something up[]." Williams's later message to Gstone Locsta that someone was "bringing [him] that big thang from Vegas" so "it's on" strongly suggests Deantae was directing Williams to try to get an assault rifle to use in GTC's retaliation. In light of the People's clear election to prosecute a single, discrete criminal agreement, the trial court did not err in omitting the unanimity instruction.

C. *The Trial Court Did Not Err in Denying Williams's Request for a Self-defense Instruction*

    1. *Trial court proceedings*

Williams's attorney requested the trial court instruct the jury with CALCRIM No. 3470, regarding the right to self-defense or defense of another, and CALCRIM No. 3471, regarding the

right to self-defense in mutual combat. Williams's attorney argued the evidence supported the instruction because the jury could find Williams shot at 456 gang members during the August 29 shootout, the final overt act alleged as to the conspiracy to commit murder, only in self-defense. The court denied the request, reasoning that "if there's an agreement to commit murder, the overt act has to be in furtherance of that agreement in order for the crime of conspiracy to have been committed. And if the shooting of a gang member was done not in furtherance of an agreement, or if there was no agreement, then they are not guilty of conspiracy to commit the offense."

During closing argument, Williams's attorney asserted that on August 29 Williams, Buckner, Slayton, and Deantae were chased by the 456 members, and after the GTC members crashed their vehicle, the 456 members attacked. Williams's attorney asserted the 456 members were the aggressors "[a]nd if GTC, in running away, shot, it's a reasonable inference from the evidence that that could be in self-defense." In rebuttal, the prosecutor acknowledged the GTC members were being "chased down" by the 456 members, but argued "self-defense does not apply to a conspiracy." Further, the ballistics evidence showed the GTC members continued to fire on the 456 members' car even while the 456 members' car drove away, demonstrating the GTC members' intent to kill.

2.      *Substantial evidence did not support instructing the jury with self-defense as to the conspiracy*

Williams contends the trial court prejudicially erred by denying his request for a self-defense instruction. The People argue self-defense is inapplicable to conspiracy to commit murder, and even if it is a defense to the crime, the evidence did

34

not support the instruction.  The People have the better argument as to the latter contention.

Homicide is justified when it is committed in self-defense, that is, when the defendant actually and reasonably believes the killing is necessary to avert imminent bodily injury or death. (*Beck and Cruz, supra*, 8 Cal.5th at p. 648; accord, *People v. Elmore* (2014) 59 Cal.4th 121, 133-134; §§ 197, 198.)  "'[S]uch a killing is not a crime.'" (*Beck and Cruz*, at p. 648; *Elmore*, at p. 134.)  Because a conspiracy to commit murder requires proof the defendant acted with the specific intent unlawfully to kill, self-defense could be (in a narrow set of circumstances) a complete defense to a charge of conspiracy to commit murder, contrary to the People's first line of argument.

We can envision a situation, such as that described by Williams in his brief, wherein cohabitants jointly agree to use lethal force in response to a violent home invasion where each actually and reasonably believed in the need to defend against imminent bodily injury or death.  The People's argument that self-defense cannot apply to conspiracy to commit murder because the target offense of the conspiracy need not be completed ignores the fact that the prosecution must prove the defendant entered the agreement with the specific intent unlawfully to kill.  Because a killing done in perfect self-defense is not unlawful, neither could an agreement made to commit such an act be unlawful.

However, "'"[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense.*"'"  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1049; accord, *People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)  An instruction is not required where only "[s]peculative, minimal,

35

or insubstantial evidence" supports the instruction. (*People v. Simon* (2016) 1 Cal.5th 98, 132, 134 [evidence did not support giving instruction on imperfect self-defense].) As discussed, we review de novo whether the specific instruction was required. (*People v. Sorden, supra*, 65 Cal.App.5th at p. 615; *People v. Hernandez, supra*, 217 Cal.App.4th at p. 568.)

Williams contends substantial evidence supports a jury finding the agreement to kill was formed on August 29, only after Wright and other 456 members opened fire on Williams, Buckner, Slayton, and Deantae in the crashed SUV. Williams asserts the GTC members might have then fired back only in self-defense, noting Deantae's jailhouse call to Carter, in which he stated, "I was on my way home" when "[t]hey got behind us." According to Williams, "The moments after the crash . . . provided the strongest evidence that appellant and at least one other person agreed and intended to kill."

Williams's argument fails because there is no evidence the occupants of the crashed SUV reached a spontaneous agreement to kill the 456 members firing upon them at that moment, and certainly no substantial evidence requiring an instruction on self-defense. Rather, the evidence shows only that some of the GTC members, possibly including Williams, returned fire. Consistent with the absence of evidence the group formed a spur-of-the-moment agreement (as Williams puts it), the prosecution's theory of the case, in both evidence and argument, was that Williams conspired with fellow GTC members to kill 456 members in response to the disrespectful music video Wright made in GTC territory. In light of the evidence presented at trial, the jury may well have not have found the August 29 shootout was an overt act in furtherance of the conspiracy, but no reasonable juror would

convict Williams of conspiracy to commit murder based on the unsupported theory that Williams and his confederates spontaneously conspired to kill the 456 members firing upon the SUV after the crash.

D.     *The Trial Court Did Not Err in Allowing Detective Dolgovin To Testify Regarding Messages Exchanged Among Defendants and Uncharged Persons*

1.     *Trial court proceedings*

During cross-examination of Detective Dolgovin, Williams's attorney inquired whether Williams's messages that 456 members needed to "die" were sent to Buckner, Slayton, or Deantae.  Detective Dolgovin answered he "believ[ed] that specific message was sent to somebody else."

On redirect examination, the prosecutor asked Detective Dolgovin about a photograph showing numerous GTC members "flashing gang signs all together."  The detective confirmed he had seen the photo and it showed 10 to 15 persons.  The prosecutor then inquired, "[B]ased on the Facebook messenger message . . . [was there] a larger number of people involved in the agreement, the conspiracy, whatever you want to call it, to acquire firearms than are those people that are just in court right now?  There's other uncharged, co-conspirators involved in this case; is that correct?"  Williams's attorney objected that the question was speculative and lacked foundation, but the court overruled the objection.  Detective Dolgovin answered, "Yes, there are messages to other people talking about obtaining firearms, about shipping them out overnight, to providing ammo, things of that sort, yes."  The prosecutor continued, "And people were messaging . . . to and from individuals who are in this case,

37

in this courtroom right now about having to retaliate and put in work, and 'how do you guys live with yourself,' or 'this kind of thing happening in our hood,' all that kind of stuff?" Williams's attorney again objected based on "foundation and speculation." The trial court then asked the witness, "Are you aware of other messages from others concerning the same topics?" Detective Dolgovin answered, "Yes."

2. *Williams forfeited the argument Detective Dolgovin presented an improper opinion on Williams's guilt, and in any event, the argument lacks merit*

Williams contends the trial court erred in allowing Detective Dolgovin to testify regarding messages shared among the defendants and other uncharged persons, arguing the testimony improperly invaded the province of the jury by addressing the ultimate issue of Williams's guilt or innocence. The People respond that Williams forfeited this contention by failing to object on this specific ground in the trial court, and in any event, the testimony was properly admitted.

We agree Williams forfeited the argument by failing to raise this issue in the trial court. Generally, a defendant must raise in the trial court a timely objection "stated as to make clear the specific ground of the objection" to preserve for appeal a claim the evidence was erroneously admitted. (Evid. Code, § 353; see *People v. Cordova* (2015) 62 Cal.4th 104, 135.) Although Williams's counsel objected based on speculation and lack of foundation, those objections are not sufficient to preserve the claim asserted on appeal that Dolgovin gave improper opinion testimony regarding Williams's guilt. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 81 [trial counsel's objection for lack

38

of foundation instead of impermissible opinion on witness credibility forfeited improper opinion claim]; *People v. Lund* (2021) 64 Cal.App.5th 1119, 1150 [defendant's objections of hearsay, leading, and speculation did not preserve argument the prosecutor committed misconduct in questioning of officer because prosecutor questioning amounted to testifying as a witness].)

Even if Williams had not forfeited his claim, it lacks merit. "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805; see *People v. Duong* (2020) 10 Cal.5th 36, 60.) However, "'a witness cannot express an opinion concerning the guilt or innocence of the defendant. . . . [O]pinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.'" (*Duong*, at p. 60; accord, *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 55.) We review evidentiary rulings for an abuse of discretion. (*People v. Caro* (2019) 7 Cal.5th 463, 503; *People v. Lightsey* (2012) 54 Cal.4th 668, 729.)

Detective Dolgovin did not opine as to the ultimate question whether Williams was guilty of conspiracy to commit murder. Rather, he testified he was aware of messages to and from uncharged individuals about such things as obtaining firearms and ammunition and putting in "work" for the gang. Williams argues the wording of the prosecutor's question "is relevant to a reasonable interpretation of the witness's answer," relying on *People v. Margarejo* (2008) 162 Cal.App.4th 102, 107. Williams is correct that a prosecutor's question informs the

witness's answer, but Williams makes too much of the prosecutor's choice of words. The prosecutor asked whether the Facebook messages showed a "conspiracy, [or] whatever you want to call it, to acquire firearms" and Facebook messages between "uncharged co-conspirators." But Detective Dolgovin did not use this phrasing in his answer, simply responding that there were messages to "other people" about obtaining firearms and ammunition and putting in "work." And the Facebook messages that were the subject of the prosecutor's questions were admitted into evidence, discussed at length in trial testimony, and available to the jury during its deliberations. No reasonable juror would have interpreted Detective Dolgovin's answers as offering an opinion that Williams was guilty of conspiracy to commit murder (as opposed to focusing on whether other uncharged persons were involved). (See *People v. Sandoval* (2015) 62 Cal.4th 394, 415 [sergeant's testimony that gangs often bring assault weapons to a planned retaliation against a rival gang leader, so they can attack the police if they arrive during the confrontation, did not offer an impermissible opinion as to defendant's guilt on murder charge]; *People v. Prince* (2007) 40 Cal.4th 1179, 1227 [FBI agent's testimony he believed the same person committed all the murders "did not bind the jury" and would not have been understood to mean the jury should find the defendant guilty].)[21]

---

[21] Because we conclude Williams's contention lacks merit, we do not reach his argument his attorney provided ineffective assistance of counsel by failing to object.

E.     *Any Error in Admitting the Recording of Wright's Statements During the* Perkins *Operation Was Harmless*

      1.     *Trial court proceedings*

Before trial, the prosecutor sought to introduce the audio recording of Wright's jailhouse conversation with an undercover agent made during the *Perkins* operation. At the time Wright was a codefendant in the case. The prosecutor argued the recording was admissible because Wright was unavailable to testify. Williams's attorney objected to the admission of Wright's identification of "Awacc" as a GTC member who was present during the shootout, noting Williams would have no ability to cross-examine Wright on the issue unless Wright voluntarily testified at trial. The court deferred its ruling.

During jury selection, Wright pleaded no contest to the attempted murders of Williams, Buckner, Slayton, and Deantae, admitted the charged firearm and gang enhancements, and agreed to a 30-year sentence.[22] As part of the plea, Wright waived his right to appeal. At the hearing, the prosecutor noted, "We are not calling [Wright] as a witness in this matter." The court set Wright's sentencing for February 21, 2020, but later continued it to February 28. When the trial proceedings resumed, the court announced to the jury, "Mr. Wright is no longer part of this trial."

On February 4, 2020, the day before the People's case began, the trial court reviewed the audio recording of the *Perkins* operation. Williams's attorney argued Wright's identification of

---

[22]     On June 9, 2022 we granted Williams's request for judicial notice of the trial court's minute orders dated January 31 (entry of Wright's plea), February 21 (continuing Wright's sentencing), and February 28, 2020 (sentencing).

"Awacc" was not reliable, but he did not seek to exclude the remainder of the recording. The court ruled it would admit the entire recording into evidence.

On February 18 Williams's attorney renewed his objection to the recording of the *Perkins* operation before the People played it for the jury. He noted that Wright was no longer a defendant in the case, and admission of the evidence would deny Williams the ability to confront and cross-examine Wright. The prosecutor argued in response, "The fact that Mr. Wright is not here has no legal effect upon the admissibility analysis." The court overruled Williams's objection, and the prosecutor played the recording for the jury.

The trial court sentenced Wright on February 28, the same day the jury returned its verdict.

2. *Governing law*

"Although hearsay statements are generally inadmissible under California law (Evid. Code, § 1200, subd. (b)), the rule has a number of exceptions." (*People v. Grimes* (2016) 1 Cal.5th 698, 710; accord, *People v. Landau* (2016) 246 Cal.App.4th 850, 866 ["Hearsay evidence is inadmissible '[e]xcept as provided by law.'"].) Evidence Code section 1230 provides a hearsay exception for statements against interest: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability . . . , that a reasonable man in his position would not have made the statement unless he believed it to be true." (See *People v.*

*Chhoun* (2021) 11 Cal.5th 1, 47; *Grimes*, at pp. 710-711.)  "To satisfy the exception, the proponent "'must show 'that the declarant is unavailable, that the declaration was against the declarant's penal [or other] interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.'"'"  (*Chhoun*, at p. 47; accord, *Grimes*, at p. 711.)  As relevant here, Evidence Code section 240, subdivision (a)(1), defines "'unavailable as a witness'" to mean the declarant is "[e]xempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant."

"One such privilege, the exercise of which makes a person unavailable as a witness, is the constitutional privilege against self-incrimination."  (*People v. Cudjo* (1993) 6 Cal.4th 585, 616; accord, *People v. Duarte* (2000) 24 Cal.4th 603, 609 ["Having invoked his Fifth Amendment right not to incriminate himself, [the defendant] was, for hearsay rule purposes, not available as a witness."].)  The privilege against self-incrimination has two aspects:  it protects a defendant in a criminal case from being called to the stand as a witness and testifying in the defendant's own trial, and it protects any person from being required to give answers in any proceeding that tend to incriminate the person. (*People v. Ford* (1988) 45 Cal.3d 431, 439 & fn. 5; *Black v. State Bar of California* (1972) 7 Cal.3d 676, 685; Evid. Code, §§ 930, 940.)  As to the latter aspect of the right, "a witness who has not exercised his privilege against self-incrimination is not an 'unavailable' witness."  (*Ford*, at p. 435; see *People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1547 ["A witness who *successfully asserts* the privilege against self-incrimination is unavailable to testify for these purposes."  (Italics added.)].)  "[I]n

order to assert the privilege against self-incrimination a witness must not only be called, but must also be sworn." (*Ford*, at p. 440; accord, *People v. Harris* (1979) 93 Cal.App.3d 103, 117 ["[B]efore a claim of privilege can be sustained, the witness should be put under oath and the party calling him be permitted to begin his interrogation. Then, the witness may invoke his privilege with regard to the specific question and the court is in a position to make the decision as to whether the answer might tend to incriminate the witness."].)

We review for an abuse of discretion a trial court's decision whether a statement is admissible under Evidence Code section 1230. (*People v. Chhoun, supra*, 11 Cal.5th at p. 47; *People v. Grimes, supra*, 1 Cal.5th at pp. 711-712.)

3. *The trial court erred in finding Wright was unavailable as a witness, but the error was harmless*

Williams's sole contention as to admission of Wright's statements during the *Perkins* operation is that the court erred in finding Wright was unavailable as a witness after he pleaded no contest and was no longer a codefendant in Williams's trial because the court did not require the People to call Wright as a witness. The People assert Wright was unavailable because his absolute privilege against being called to testify at his own trial persisted despite his guilty plea, until at least his sentencing.[23]

---

[23] We decline to find Williams forfeited his contention, as argued by the People. Williams's attorney's objections were sufficient "'to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.'" (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

The People's argument conflates the two aspects of the privilege against self-incrimination. The People are correct the privilege not to give answers tending to incriminate one's self generally survives a guilty plea and persists at least until sentencing. (*People v. Fonseca* (1995) 36 Cal.App.4th 631, 635 ["it is clear in California that one retains the privilege [against self-incrimination] at least until he has been sentenced and, if he appeals, pending resolution of the appeal"]; *People v. Kizzee* (1979) 94 Cal.App.3d 927, 938 ["an accused does not lose his privilege against self-incrimination until he has been sentenced"].) Thus, arguably had Wright been called to testify, he could have validly invoked his privilege against self-incrimination.

However, it does not follow that Wright possessed the narrower privilege against being called to testify at his own trial. Simply put, Wright was no longer on trial after he pleaded no contest. Thus, for Wright to assert the privilege against self-incrimination, he needed to be called and sworn. (*People v. Ford*, *supra*, 45 Cal.3d at p. 440.) Because Wright was never called and sworn, and therefore never asserted the privilege, the trial court erred in finding he was unavailable to testify for purposes of Evidence Code section 1230.

Although we find error, we agree with the People the error was harmless. We will not reverse a judgment for the improper admission of hearsay in violation of state statutory law unless it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Valencia* (2021) 11 Cal.5th 818, 840; *People v. Landau, supra*, 246 Cal.App.4th at p. 866 ["As a general rule, the erroneous

45

admission of hearsay evidence will not result in a reversal unless it is reasonably probable the defendant would have received a more favorable result had the evidence not been admitted."].)[24]  It

[24]     We reject Williams's contention we must assess the error under the federal constitutional standard of *Chapman v. California, supra,* 386 U.S. at page 24, which requires any error be harmless beyond a reasonable doubt.  Williams's argument the error violated his right to confrontation fails because he has not shown Wright's statements during the *Perkins* operation were testimonial under *Crawford v. Washington* (2004) 541 U.S. 36, 68-69 because "the statement must have been given and taken primarily for the purpose ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial."  (*People v. Cage* (2007) 40 Cal.4th 965, 984, italics omitted; accord, *People v. Gallardo* (2017) 18 Cal.App.5th 51, 67; see *Davis v. Washington* (2006) 547 U.S. 813, 825 ["statements made unwittingly to a Government informant" are nontestimonial].)  As we explained in *Gallardo*, "[a]lthough the declarant and the interrogator's perspectives are both relevant to determining the 'primary purpose' of the statement [citation] . . . , it is '"in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate.' [Citation.]' [Citation.].  The Sixth Amendment applies when the statement, rather than the question that elicited it, was made 'with some degree of formality or solemnity.'"  (*Gallardo*, at pp. 67-68 [statements to wired jailhouse informants were not testimonial because declarant had no belief his statements were being monitored and would be used in prosecution].)  As in *Gallardo*, it is clear Wright did not make the statements to the undercover officer expecting his statements would be monitored and used at trial.

Nor has Williams shown the error deprived him of due process by rendering his trial fundamentally unfair.  (See *People v. Partida, supra*, 37 Cal.4th at p. 439 ["[a]bsent fundamental unfairness, state law error in admitting evidence is subject to the

is not reasonably probable Williams would have received a more favorable result absent the admission of Wright's statements.

As discussed, the evidence against Williams was strong, and the most compelling evidence of Williams's participation in a conspiracy to kill 456 gang members was the series of messages sent and received by Williams after he learned Wright made a music video in GTC territory. Although Wright identified "Awacc" as a GTC member present during the August 29 shootout, ample other evidence placed Williams at the scene, including that Williams's phone and mail were found inside the SUV; Williams was arrested near the crash site shortly after the incident; and DNA evidence linked Williams to the assault rifle, handgun, and polo shirt found near the scene.

Williams argues he was prejudiced by Wright's statement a GTC member held a gun out of the window of the SUV but did not shoot, given Detective Dolgovin's opinion that it could have been Williams attempting to fire the misloaded assault rifle, thereby making Williams as the potential shooter sound more culpable than the other defendants. But Williams's jailhouse call also provided evidence a GTC member attempted to, but could not, fire the assault rifle at 456 members. Williams asked the person on the call to "tell D-3 . . . that shit that he brought out here to a nigga did not work at all." Williams had previously sent a Facebook message to Avalos asking him to get an assault rifle

---

traditional *Watson* test"]; *People v. Dryden* (2021) 60 Cal.App.5th 1007, 1025-1026 ["For the erroneous admission of evidence to amount to a denial of due process, the evidence must have been "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'""].)

"from D3."  In addition, DNA obtained from the assault rifle magazine showed Williams was a 40 percent contributor, with three other contributors.  In light of this evidence that placed Williams at the scene and pointed to one of the GTC members in the SUV attempting but being unable to fire the assault rifle, it is not reasonably probable exclusion of Wright's statements would have changed the outcome.

F.      *Assembly Bill 333 Requires Reversal of the Gang Enhancements*

Section 186.22 provides for enhanced punishment when a defendant is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1).)  Effective January 1, 2022, Assembly Bill 333 made significant modifications to the requirements for proving a criminal street gang enhancement.  As relevant here, Assembly Bill 333 modified the definition of "'pattern of criminal gang activity'" in section 186.22, subdivision (e).  Formerly, the law required proof of two or more predicate offenses enumerated in that subdivision, "provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons."  As amended, subdivision (e)(1) now requires proof that "at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense *and within three years of the date the current offense is alleged to have been committed*, the offenses

48

were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, *and the common benefit of the offense is more than reputational*." (§ 186.22, subd (e)(1), italics added.) Further, "[t]he currently charged offense shall not be used to establish the pattern of criminal gang activity." (§ 186.22, subd. (e)(2).) New section 186.22, subdivision (g), provides, "As used in this chapter, to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

In *In re Estrada* (1965) 63 Cal.2d 740, the Supreme Court held that statutory amendments that reduce the punishment for an offense apply retroactively to a defendant whose judgment is not yet final absent a contrary legislative intent. (*Id.* at p. 745; see *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299 [discussing *Estrada* and its progeny].) Assembly Bill 333's changes to the required elements to prove a section 186.22 gang enhancement apply retroactively to Williams's conviction under *Estrada*. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206-1207 [Assembly Bill 333's amendments to the elements of a section 186.22 gang enhancement "have the effect of 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement,' with obvious benefit to defendants"]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478 ["Assembly Bill 333's substantive changes apply retroactively to all cases . . . in which the judgment of conviction is not yet final

49

because the changes 'redefine, to the benefit of defendants, conduct subject to criminal sanctions.'"]; *People v. Delgado, supra*, 74 Cal.App.5th at p. 1087 ["Although the amendments effective in 2022 do not alter the punishment imposed for a gang enhancement, *Estrada* retroactivity applies because the amendments increase the threshold for imposition of the enhancement."].)

Williams contends, the People concede, and we agree reversal of the gang enhancements is required. There was no evidence with respect to the predicate offenses committed by Alrazaa and Ezeh that the conduct provided a common benefit to GTC that was more than reputational. And with respect to the third predicate act, the May 8, 2015 murder of Montgomery for which Parker and Smith were convicted, the offense did not occur within three years of the underlying August 2018 offenses. (§ 186.22, subd. (e)(1).) Thus, these convictions do not meet the new requirements of section 186.22 and must be reversed. We remand to give the prosecution an opportunity to retry the gang enhancements under current law. (See *People v. E.H., supra*, 75 Cal.App.5th at p. 480 ["The proper remedy for this type of failure of proof —where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges."]; *People v. Lopez* (2021) 73 Cal.App.5th 327, 346 [vacating gang enhancements in light of Assembly Bill 333 and remanding for limited retrial].) Further, "Assembly Bill 333's changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22." (*Lopez*, at p. 346.) As a result, the suspended 25-years-to-life third strike sentence on count 4 must also be vacated because the

conviction of violating section 29800, subdivision (a)(1), does not qualify as a serious felony without the gang enhancement. (See § 1192.7, subd. (c)(28) [defining "'serious felony'" under the three-strikes law to mean "any felony offense, which would also constitute a felony violation of Section 186.22"].)[25]

G.   *Assembly Bill 333 Does Not Require Reversal of Williams's Convictions on Counts 1 and 4*

In addition to the definitional changes to section 186.22, Assembly Bill 333 added section 1109, which requires trial of a gang enhancement charged under section 186.22, subdivision (b), be bifurcated from and follow trial of the underlying offenses if requested by the defendant. (§ 1109, subd. (a); Stats. 2021, ch. 699, § 5, pp. 11-12.) Williams contends section 1109 also applies retroactively to his case. (See *People v. Montano* (2022) 80 Cal.App.5th 82, 108 [holding section 1109 is retroactive to nonfinal cases]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1130 [same]; *People v. Burgos* (2022) 77 Cal.App.5th 550, 568, review granted July 13, 2022, S274743 [same].) The People argue the bifurcation provision is not retroactive. (See *People v. Boukes* (2022) 83 Cal.App.5th 937, 948, review granted Dec. 14, 2022, S277103 [section 1109 is not an ameliorative statute that reduces punishment; accordingly, it does not apply

---

[25]   The amendment to section 186.22, subdivision (b)(3), constraining the trial court's discretion to impose the upper (or lower) term of a gang enhancement became effective January 1, 2023. If the People elect to retry the gang enhancements and the jury finds they are true, the amendment to subdivision (b)(3) would apply to Williams's resentencing.

retroactively]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Oct. 12, 2022, S275341 [same].)

In *People v. Tran, supra*, 13 Cal.5th 1169, the Supreme Court recognized this split of authority among the Courts of Appeal but declined to resolve the question whether section 1109 applies retroactively, instead concluding the asserted error in failing to bifurcate was harmless under the *People v. Watson, supra*, 46 Cal.2d 818 standard for state-law error. (*Tran*, at pp. 1208-1210.) So too here, even if section 1109 is retroactive, any error in denying Williams's request to bifurcate trial of the gang allegations is not reasonably likely to have affected the outcome. Williams argues evidence of murders and assaults committed by members of GTC and 456 would not have been admitted had the proceedings been bifurcated. But the most inflammatory evidence presented—the 2015 murder of 456 member Montgomery by GTC members Parker and Smith—was relevant to show the violent nature of the conflict between the two gangs in 2018, which would have been admissible (subject to an Evidence Code section 352 motion) to show the motive for commission of the charged offenses even had the court bifurcated trial of the gang enhancements. The other predicate offenses were for possession of a firearm and criminal threats, and Officer Sacca's testimony as to GTC's primary activities included only the general statement that GTC's primary activities included robbery, assault with a deadly weapon, and murder, among other crimes. Williams moved for bifurcation of the trial on the gang allegation based on the prejudicial nature of the evidence, but the trial court denied the motion on the basis the gang evidence was necessary to understand the gang war that led to the shooting and the motive to retaliate. In light of the nature of the

testimony regarding the underlying offenses, including the GTC gang members' efforts to obtain guns and ammunition to retaliate against the 456 gang and the text messages stating that 456 members needed to die, it is not reasonably probable Williams would have obtained a more favorable verdict had Officer Sacca's testimony not been admitted in the prosecution's case-in-chief.

H. *Assembly Bill No. 518 Requires Resentencing*

Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441), effective January 1, 2022, amended section 654 "to remove the requirement that a court impose the longest sentence when a defendant is convicted of more than one offense arising from the same conduct." (*People v. Lopez* (2022) 78 Cal.App.5th 459, 468; accord, *People v. Mani* (2022) 74 Cal.App.5th 343, 351.) Williams argues, the People concede, and we agree this case should be remanded for resentencing so the trial court may exercise its discretion whether to sentence Williams on count 1 or 4, and then, pursuant to amended section 654, to impose and stay execution of sentence on the other count.

I. *Williams Was Not Prejudiced by the Cumulative Effect of the Errors*

Williams contends he suffered cumulative prejudice from multiple errors. "'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009; accord, *In re Reno* (2012) 55 Cal.4th 428, 483 ["In theory, the aggregate prejudice from several

different errors occurring at trial could require reversal even if no single error was prejudicial by itself."].) In evaluating cumulative prejudice, we consider whether the aggregate errors caused the trial to be fundamentally unfair in violation of the Fourteenth Amendment's due process guarantee. (*People v. Rogers* (2006) 39 Cal.4th 826, 890; *Cunningham*, at p. 1009 [cumulative error did not render trial "fundamentally unfair," observing "[d]efendant was entitled to a fair trial but not a perfect one"]; *People v. Thomas* (2021) 64 Cal.App.5th 924, 971 ["'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."'"].)

Considered cumulatively, the three errors we found or assumed did not affect the outcome of Williams's trial or render it fundamentally unfair. As discussed, the jury instruction on implied malice murder was harmless beyond a reasonable doubt, and there is no reasonable probability the admission of Wright's testimony or the denial of Williams's bifurcation motion affected the outcome at trial.

## DISPOSITION

Williams's convictions on counts 1 and 4 are affirmed. The true findings on the criminal street gang enhancements are reversed, and Williams's sentence is vacated. The matter is remanded to provide the People an opportunity to retry the enhancements. If the People elect not to do so, Williams is to be resentenced in a manner consistent with this opinion and all applicable ameliorative legislation.

FEUER, J.

We concur:

PERLUSS, P. J.

SEGAL, J.